53 CCPA

**Application of Ronald Harry HALLIWELL.**

**Patent Appeal No. 7550.**

United States Court of Customs and Patent Appeals.

April 28, 1966.

Edwin Tocker (Frederick Schafer, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (J. F. Nakamura, Washington, D. C., of

counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

KIRKPATRICK, Judge.

This appeal is from the decision of the Board of Appeals affirming the rejection of claims 1–6 in appellant's patent application[1] for "Process for the Manufacture of Perfluoroolefins."

The application relates to a process for co-synthesis of hexafluoropropylene ($CF_3-CF=CF_2$, hereafter termed HFP) and tetrafluoroethylene ($CF_2=CF_2$, TFE) by pyrolysis[2] of chlorodifluoromethane ($CHClF_2$, CFM). The ethylenically unsaturated fluorocarbons TFE and HFP are known in the art to be useful in formation of chemically inert resinous copolymers.

Appellant provides the following background information in his specification:

It has been known heretofore that tetrafluoroethylene may be pyrolysed to give hexafluoropropylene. Under certain critical conditions high yields may be obtained. See, for example, U. S. Patent 2,758,138 issued to D. A. Nelson on August 7, 1956.

It has also been known that chlorodifluoromethane may be pyrolysed to give tetrafluoroethylene, for example, as described by Downing in U. S. Patent 2,551,573 issued May 8, 1951.

It has not been known heretofore, however, that hexafluoropropylene can be prepared directly from chlorodifluoromethane by pyrolysis in high yield.

It has been discovered that when chlorodifluoromethane is pyrolysed at low conversion[3] so that a high yield[4] of tetrafluoroethylene is formed, a small amount of hexafluoropropylene is also formed. The quantity thus formed is too small to be of economic significance. As the percentage conversion is increased by increasing the temperature, or the contact time, or both, the amount of hexafluoropropylene formed also increases. On the other hand, the unwanted side products, hereinafter called "unrecoverables", also increase, and at a rate twice as great as the rate of increase of the hexafluoropropylene. However, in the range between 86% conversion and 94% conversion a highly surprising effect has been found. In that range the concentration of hexafluoropropylene suddenly increases until the proportion of hexafluoropropylene is comparable with and may exceed the concentration of tetrafluoroethylene. Moreover, the increase in yield with conversion is accompanied by an increase of 0.8 parts of unrecoverables per part of hexafluoropropylene as compared with over 2.0 parts of unrecoverables per part of hexafluoropropylene at lower conversion. Above about 90% conversion, the yield of unwanted products itself shows a sharp increase, and beyond about 94% conversion, the yield becomes less favorable economically. * * *

---

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Serial No. 58,895, filed September 28, 1960.

2. A pyrolysis reaction occurs essentially through the agency of heat, resulting here in the breakdown of the CFM molecule into smaller fragments, termed free radicals, and the recombination of those fragments into larger molecules.

3. Conversion means the percent of starting material changed to other products, desirable or otherwise.

4. Yield is a measure of converted material that is desired product. Appellant points out that, in the chemical industries, it is sometimes necessary to operate at low "conversion" in order to get high "yield" of desired product and little waste.

The subject matter is reflected in claim 1:

1. A process for the co-synthesis of hexafluoropropylene and tetrafluoroethylene which comprises pyrolyzing chlorodifluoromethane at a temperature in the range between 700° C. and 900° C. at a partial pressure between 0.1 and 2.0 atmospheres and at a conversion level between 86% and 94% based on the chlorodifluoromethane charged, cooling the reaction product and thereafter separating tetrafluoroethylene and hexafluoropropylene from the reaction product.

The examiner and the board rejected the claims as "unpatentable over Downing * * * considered with Nelson," the two patents to which appellant had referred for background purposes in his specification. Their reasons for maintaining and rejection differ in material respects and, since the examiner's position was not specifically reversed by the board (Rule 196(a)), we shall discuss the propriety of both positions as raised by appellant's reasons of appeal and brief. In re Rubinfield, 270 F.2d 391, 47 CCPA 701.

The examiner's description of the references, which we find to be accurate for our purposes here, and his reasons for the rejection are set forth in his Answer as follows:

* * * Downing et al. discloses pyrolyzing chlorodifluoromethane at temperatures between 600° to 1000° C. * * * at pressures between 0.1 and 10 atmospheres * * *, at conversions levels from 30% to 100% * * *. The compound, tetrafluoroethylene is disclosed as being produced by the process * * *. Although there is no indication in Downing et al. that hexafluoropropylene is also a product of the said pyrolysis, the examples in Downing et al. disclose that a variety of products are produced in the pyrolysis of chlorodifluoromethane. Since hexafluoropropylene has a boiling point of about –29° C. it might be present in the apparently unanalyzed fractions boiling above –40° C. in examples 1 and 9 of Downing et al. It is also noted from appellant's remarks of April 16, 1963, * * *, that in the process as disclosed by Downing et al. some hexafluoropropylene is produced in minor amounts. It would therefore appear obvious to determine what conditions within the range of conditions disclosed by Downing et al. leads to simultaneously high yields of tetrafluoroethylene and perfluoropropene.[5] The Nelson reference discloses that tetrafluoroethylene can be pyrolyzed to produce perfluoropropene and therefore it would appear obvious to adjust the pyrolysis conditions disclosed by Downing et al. in the pyrolysis of chlorodifluoromethane to produce substantial yields of both tetrafluoroethylene and perfluoropropene.

* * * * * *

* * * although Downing et al. does not specifically state that perfluoropropene is produced, the instantly claimed reaction conditions fall within the scope of those conditions disclosed by Downing et al. and thus there is reason to believe that besides tetrafluoroethylene, that perfluoropropene is also produced by Downing et al. Although Downing et al. did not analyze in each of their examples all of the products formed, appellants appear to concede, as noted supra, that conditions outside the instantly claimed critical range and also within the range disclosed by Downing et al. do produce some perfluoropropene along with tetrafluoroethylene. No invention is thus seen in optimizing the conditions in order to produce substantial yields of perfluoropropene along with tetrafluoroethylene, particularly since Nelson would indicate to one skilled in the art that tetrafluoroethylene itself pyrolyzes to produce perfluoropropene. It will be noted that the examiner, to support his position that Downing obviously prepared HFP, twice referred to an alleged admission of appellant in the rec-

---

5. "Perfluoropropene" is another name for the compound "hexafluoropropylene."

ord that Downing does in fact produce HFP in minor amounts. We have examined that purported admission [6] and agree with appellant that it cannot serve explicitly or implicitly as prior art to be used in rejecting the claims.

The question remains whether there is any competent evidence to suggest that both HFP and TFE can be prepared by Downing's process. In its decision, the board appears to have adopted, in part, an earlier position of the examiner set forth in his final rejection that "it appears evident from the Nelson disclosure that the hexafluoropropylene is a product of the Downing pyrolysis * * *." The board stated:

> * * * since the prior art has recognized the desirability of co-synthesizing hexafluoropropylene and tetrafluoroethylene, all that one skilled in the art would have to do, in order to obtain such a mixture, would be to direct a *sequential* operation by carrying out the Downing et al. process of pyrolyzing chlorodifluoromethane to obtain tetrafluoroethylene, and then proceed with Nelson's process by pyrolyzing the tetrafluoroethylene obtained in Downing et al. The process before us merely amounts to no more than the preparation of the precursor material (tetrafluoroethylene) *in situ*, by means of the Downing et al. process, then proceeding with the Nelson process to obtain his (Nelson) desired mixture. It is, therefore, our opinion that the claimed process fails to patentably differentiate from and merely follows the suggestion of, the combined suggestions of the references. All appellant has done is to determine the optimum conversions necessary to obtain the best combination of hexafluoropropylene and tetrafluoroethylene, which, in our opinion, is without patentable merit.

At this point, it becomes necessary to describe in somewhat greater detail the disclosure of each of Downing and Nelson. Downing discloses that during the pyrolysis of CFM intermolecular dehydrochlorination of the CFM molecule predominates, stating:

> * * * when $CHClF_2$ is pyrolyzed, one molecule may lose a hydrogen and another may lose a chlorine to form the free radicals $-CClF_2$ and $-CHF_2$, which radicals may further pyrolyze to the free radical $=CF_2$, [difluorocarbene radical]. Such free radicals condense to form compounds of higher molecular weight, represented by $CF_2=CF_2$, $CClF_2CHF_2$, $C_4F_8$ and the compounds of the series $H(CF_2)n-Cl$ in which $n$ is at least 3 * * *.

While Downing carries out his process of producing TFE by passing CFM through a tubular reactor under pressure and temperature conditions closely approximating those employed by appellant and over a range of CFM conversions of 30–100%, Downing mentions neither obtaining HFP nor operating at any specific conversion level of CFM falling within the range of 86–94% specified by appellant in his claims.

Nelson pyrolyzes TFE to HFP in a tubular reactor by a reaction he formulates as:

$$CF_2=CF_2 \rightarrow 2 =CF_2$$

$$CF_2=CF_2 + =CF_2 \rightarrow CF_3CF=CF_2$$

The reaction conditions employed by Nelson are a temperature of 750°–900° C., a partial pressure of TFE of 0.033 to 0.26 atm, and a flow rate of TFE of 20–5000 grams/liter/hour.

Appellant urges that the respective Downing and Nelson process conditions are so different and incompatible as to

---

**6.** The statement regarded by the examiner as an admission is as follows:

> The Examiner has also taken into account the private finding of hexafluoropropylene in minor amounts in chlorodifluoromethane pyrolysates made outside the critical range. This knowledge was not in the public domain and is not prior art to the present applicant. * *

The "private finding" referred to above is appellant's discovery set forth in his specification, quoted previously in this opinion.

negate any possible suggestion by Nelson that HFP could be produced using Downing's process. In support of the board's position, the Solicitor has presented calculations derived from two of Downing's examples, the accuracy of which has not been challenged, which tend to show that, when Downing employs CFM conversion levels of 27% and 50%, TFE is produced at a space velocity and partial pressure falling within the range of those conditions disclosed by Nelson as necessary for production of HFP in his process.

It may well be that one of ordinary skill in the art, upon considering what is realistically suggested by the reference combination, would reasonably expect some HFP to be produced in Downing's process operating at CFM conversion levels of 25–50%, particularly upon recognition that both Downing and Nelson, under generally similar reaction conditions, produce difluorocarbene radicals which in the former reference are said to condense with each other to produce TFE and in the latter reference are said to condense with TFE to produce HFP. In order to recognize this fact, however, he would first have to conclude that Downing's atmosphere containing hydrogen and chlorine would not adversely affect the reactions disclosed by Nelson as taking place in an atmosphere free of those elements. We know this conclusion to be apparently correct, but principally from the disclosures contained in the present application.

In our view, however, the coincidence of two examples of Downing with Nelson's disclosure falls short of rendering the present claims obvious to one of ordinary skill. As appellant points out, Nelson discloses that certain flow rates of TFE are necessary in order to obtain desired yields of HFP. It seems to us that Downing does not reasonably suggest that those requisite flow rates of TFE will necessarily be obtained when operating his process at a CFM conversion level of 86–94%. Indeed, insofar as Downing is concerned with conversion of CFM, nearly all of his examples disclose pyrolysis of CFM at relatively low conversions, viz less than 50%, thereby obtaining high yields of TFE. Where Downing does disclose specific CFM conversion levels of 77% and 100%, he indicates that increasingly high percentages of high boiling waste material are obtained; that appears consistent with appellant's specification which discloses that, in the range outside 86–94% CFM conversion, relatively high amounts of unrecoverable waste material are formed at rates greater than the rate of HFP production.

We think insufficient reasons have been offered by the examiner and the board as to why the particular operating conditions claimed of 86–94% CFM conversion, or the yields of HFP (on the order of 30–50% of converted CFM) and the concomitant reduction in rate of increase in production of waste material obtained by appellant when operating at the claimed conversion level, would be obvious to one of ordinary skill from the references.

Considering all the factors discussed in this opinion, we think the board erred. Accordingly, the decision is reversed.

Reversed.