**Application of Wilbur H. McKELLIN, et al.**

**Patent Appeal No. 75–539.**

United States Court of Customs and Patent Appeals.

Jan. 22, 1976.

Carl A. Hechmer, Jr., Philadelphia, Pa., attorney of record, for appellants. (Howson & Howson) William E. Hedges, Charles H. Howson, Jr., Philadelphia, Pa., of counsel.

Joseph F. Nakamura, Washington, D.C., for the Commissioner of Patents. Jack E. Armore, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

LANE, Judge.

This is an appeal from the decision of the Patent and Trademark Office Board of Appeals affirming the examiner's rejection of claims 6, 7, 10–18, and 21–25, all of the claims in application serial No. 866,420, filed September 30, 1969, for

"New Vulcanizable and Vulcanized Compositions Containing Polyperoxide." We reverse.

## Background

Appellants' application returned to ex parte prosecution after appellants lost an interference with United States Letters Patent 3,409,600 to P. R. A. Maltha and S. B. Tijssen. None of the claims on appeal were counts. The sole basis of rejection is under 35 U.S.C. § 103, the rejected claims being held obvious in view of the subject matter of the counts of the interference. The sole issue on appeal is whether claims may be rejected under 35 U.S.C. § 103 on the ground that a losing party to an interference is not entitled to claims which are asserted to be obvious variations of the invention defined in the counts, when section 102(g) and interference estoppel are not applicable.

## The Interference

Appellants' parent application (serial No. 285,857) was filed in the United States Patent and Trademark Office on June 6, 1963. Subsequently, on October 10, 1963, Maltha et al. (hereinafter Maltha) filed a patent application, a division of which issued as United States Letters Patent 3,409,600 on November 5, 1968. The Maltha patent claims a process and compositions within the scope of serial No. 285,857, in the sense that an act which infringes the claims of the Maltha patent would infringe the claims of serial No. 285,857. Appellants thereafter filed a continuation-in-part application, serial No. 866,420, which is involved in this appeal. This application contained claims copied from the Maltha patent and included a request for an interference. All of the claims of the Maltha patent were copied. The class of peroxy compounds disclosed and for which protection was sought in serial No. 866,420 was broader (i. e., included more species) than the class of peroxy compounds disclosed and claimed in the Maltha patent.

Thereafter patent interference No. 97,-329 was declared between Maltha and the appellants herein. Maltha was accorded the benefit of his Netherlands application No. 284,315, filed October 12, 1962. Based *only* on their foreign priority date Maltha became the senior party and prevailed in the interference, receiving an award of priority.

During the course of the interference appellants moved to add additional counts to include species disclosed in the patent which were within the scope of the interference counts and also to add counts to species which were not disclosed in the patent but were within the scope of the interference counts. These motions were refused entry by the interference examiner.

Following the adverse award of priority, appellants' application returned to ex parte prosecution with claims directed to the species just described, as well as claims to other species neither disclosed in the patent nor within the scope of the interference counts. All of these claims differ from the interference counts in one or more material respects. Claims 6 and 13, which are representative, are reproduced in the appendix to this opinion together with the interference counts.

## The Examiner's Rejection

The examiner rejected the claims under 35 U.S.C. § 103 as unpatentable in view of the counts of the interference, or in view of the Maltha patent. The examiner concluded that the instant claims would be obvious to one of ordinary skill in the art from the counts of the interference. Appellants have made no attempt to prove any new or unexpected results.

## The Board's Decision

The board interpreted the reasoning of the examiner to mean that the subject matter sought to be patented was barred to appellants by reason of the adverse award of priority as to the counts of the interference.

The board agreed with appellants that if an interference involves two applications, a party who fails to make a mo-

tion to add all common subject matter may be estopped from later obtaining claims to such subject matter, but that if (as here) an interference involves a patent, there is no estoppel.

The board considered appellants' argument that since appellants' application had an earlier effective United States filing date than the Maltha patent, from which the claims which corresponded to the interference counts were copied, the counts could not be considered "prior art" under 35 U.S.C. § 102(g).

The board answered by saying:

We specifically indicate that the rejection is not that the claims are unpatentable over [sic, under] 35 USC 102(g) coupled with 35 USC 119. Rather, the rejection is on the basis that appellant [sic] has lost the interference and, in view of the adverse decision on priority, is not entitled to claims which correspond to or are obvious variations of the invention as defined in the counts of the interference. This is the line of reasoning advanced by the third member of the Board in the *Hilmer* case [*In re Hilmer*, 57 CCPA 985, 424 F.2d 1108, 165 USPQ 255 (1970), hereinafter *Hilmer (II)*], * * * where, while concurring in the result, he stated, "I see no reason to go beyond the concession of priority filed by Hilmer et al—".[1] Since his view was not determinative of the appeal, the court limited itself to only the correctness of the reasoning of the majority.[2]

The board noted that appellants had not alleged that their invention produced any new or unexpected result over that produced by the invention of Maltha represented by the lost counts, and held that appellants' claims "either fall within the scope of the invention defined by the counts or are obvious variations thereof." Appellants contended there is no evidence of record that the invention defined in the counts was made in this country by another before appellants' invention. The board responded:

If we were to follow appellants' reasoning to its logical conclusion, we would condone a situation in which, by presenting claims, drawn sequentially, to compounds containing carbon chains from 1 to 20 carbon atoms, or to obvious variations of the compounds, the losing party in an interference with a patent, (which relied on a foreign priority date) could be granted a patent which would cover all aspects of the invention defined in the counts of the interference as to which he has been adjudicated not to be the first inventor. Obviously, this would make a mockery of the interference practice.

### The Solicitor's Position

The solicitor, representing the Commissioner of Patents and Trademarks, has taken the position that the counts which appellants lost in the interference are "prior art" to appellants. It is the solicitor's position that having lost the counts in an interference, the subject matter of the lost counts is statutory prior art to the losing party under 35 U.S.C. § 135(a). The solicitor observes that section 135 provides that the losing party is not entitled to claim the subject matter of the lost counts. Therefore, the solicitor reasons, the subject matter of the lost counts is statutory prior art to the losing party in the same anticipatory sense as the statutory prior art de-

---

1. This concurring opinion reads *in toto*:

    Behrens, Examiner-in-Chief, Concurring.

    As to the affirmance of the rejection now considered, that of claims 10 and 16, I concur in the result. On the record I see no reason to go beyond the concession of priority filed by Hilmer et al. in Interference No. 90,218 which applied to the count corresponding to Hilmer et al. claim 15. The art, as Wagner et al. show, recognized the equivalence of the toluyl (of claim 15) and cy-

cloaliphatic radicals (of claims 10 and 16) in compounds very closely related as to structure and intended use. Appellants establish no earlier date of invention for the cycloalkyl compounds than for their toluyl analogues on which they have conceded priority. *In re Gregg*, 44 CCPA 904, 1957 C.D. 284, 720 O.G. 227, 244 F.2d 316, 113 USPQ 526 [(1957)].

2. *See Hilmer (II)*, 57 CCPA at 987, 424 F.2d at 1110, 165 USPQ at 257.

scribed in 35 U.S.C. § 102, and also within the meaning of the term "prior art" in 35 U.S.C. § 103.

## OPINION

### Section 135

■ An applicant who has lost an interference is not entitled to claims which correspond to the subject matter of the counts of the interference. A determination of priority of invention adverse to an applicant constitutes the *final refusal* by the Patent and Trademark Office of the claims involved. 35 U.S.C. § 135. Neither party contends that the claims on appeal "correspond" to the counts in the interference.

■ We turn now to the statutory construction of 35 U.S.C. § 135(a) which the solicitor here presents to this court as a novel proposition of law and for the first time in the prosecution of appellants' application. As the solicitor is well aware, this court will not ordinarily consider arguments put forward for the first time in this court. *In re Allen,* 324 F.2d 993, 998, 51 CCPA 809, 815 (1963). Nevertheless, we have elected to consider this argument in the present case because of its guidance potential and because our view thereof cannot prejudice appellants.

■ The solicitor suggests that the provision in 35 U.S.C. § 135(a) that an adverse award of priority in an interference "shall constitute the final refusal by the Patent and Trademark Office of the claims involved" means that the subject matter of the counts *is statutory prior art* to the losing party in the same anticipatory sense as the statutory prior art described in section 102—and also within the meaning of the term "prior art" in section 103. Nothing in the legislative history of 35 U.S.C. § 135(a) supports the solicitor's position. The *Reviser's Note,* 35 U.S.C.A. § 135, explains:

The first paragraph states the existing corresponding statute [R.S. 4904] with a few changes in language. An explicit statement that the Office decision on priority constitutes a final refusal by the Office of the claims involved, is added.

The *Commentary on the New Patent Act,* by P. J. Federico, 35 U.S.C.A. at 37–38, confirms this, and states further, "The sections just mentioned, 131 to 135, deal with *procedure* in the Patent Office, of which only a small part is reflected in the statute." (Emphasis added.) A reading of section 135(a) confirms that all its provisions relate to procedure rather than substance.

In support of his statutory construction, the solicitor reasons that because the claims corresponding to the counts are unpatentable to the losing party, the subject matter of the counts *must be statutory prior art* to the losing party. The weakness of this reasoning is apparent. The purpose of section 135(a) was, in part, to provide a new procedure to economize time and work in the further prosecution of the losing party's application. The final refusal of claims by the Patent and Trademark Office may be based, inter alia, on statutory prior art *or* loss of right to a patent *or* an estoppel. The inference that the counts (i. e., the subject matter of the counts) must be statutory prior art to the losing party merely because section 135(a), as a matter of Patent and Trademark Office procedure, provides for automatic "final refusal" of claims corresponding to the counts by virtue of the adverse award of priority, is unwarranted. We specifically reject the novel proposition that 35 U.S.C. § 135(a) is a statutory prior art section, and hold that neither the counts nor the subject matter of the counts is statutory prior art by virtue of this section of the statute.

### Section 103

The examiner rejected the claims under 35 U.S.C. § 103 as unpatentable in view of the counts of the interference, or in view of the Maltha patent. Since the examiner's position was not specifically reversed by the board (37 CFR 1.196(a)) we shall discuss the propriety of these positions. *In re Halliwell,* 358 F.2d 1008, 53 CCPA 1112 (1966). It was the exam-

iner's position that the subject matter of the appealed claims would have been obvious at the time appellant's invention was made to a person having ordinary skill in the art in view of the counts of the interference, i. e., the subject matter of the counts, see *Hilmer (II)*, 424 F.2d at 1110, 57 CCPA at 987, or in view of the disclosure of the Maltha patent. Since a section 103 rejection must be based on *evidence* (statutory prior art, admissions against interest, etc.) we shall first consider the status of the subject matter of the counts lost in the interference, and the disclosure of the Maltha patent, as statutory prior art with respect to the appealed claims.

The subject matter of counts lost in an interference is not, for that reason alone, statutory prior art to the losing party. We must therefore consider whether the subject matter of the counts lost in the interference falls within a prior art paragraph of section 102. If it is found that the subject matter of the lost counts is prior art under section 102, it may be used alone or in combination with other references under section 103. *In re Harry*, 333 F.2d 920, 51 CCPA 1541 (1964).

We must first determine when and where the subject matter of the lost counts was invented in order to ascertain the significance of the lost counts with respect to section 102. Appellants' parent application was filed June 6, 1963. Appellants were restricted to that date by the Board of Patent Interferences. The decision of the board awarding priority to Maltha necessarily implies that Maltha made the invention of the counts prior to June 6, 1963. We conclude that the date of the invention of the subject matter of the lost counts must be prior to June 6, 1963. The place where Maltha made the invention of the counts appears from the evidence to have been outside the United States, since Maltha was awarded priority on the basis of his Netherlands filing date.

■ The board's opinion in the present case indicates reliance on the line of reasoning advanced in the concurring opinion of the Board of Appeals in *Hilmer*

*(II)*, set forth in footnote 1, supra. The board stated that because the reasoning advanced in the concurring opinion in *Hilmer (II)* was not determinative of that appeal, this court reviewed only the correctness of the *reasoning* of the majority of the board. Our analysis should not be confined to the board's reasoning alone since we review the *decision* of the board on the stated ground of rejection and not merely its reasoning in support of that decision. *Hunt v. Treppschuh*, 523 F.2d 1386, 1388 (Cust. & Pat.App. 1975).

■ We have recently reviewed the consequences of a concession of priority with respect to the count of an interference. See *In re Ogiue*, 517 F.2d 1382 (Cust. & Pat.App.1975). Therein we held that an applicant's refusal to copy claims which he could make resulted in a *concession of priority* (termed a "disclaimer in 37 CFR 1.203(b)) that the subject matter of those claims *is the prior invention of another in this country under section 102(g)* and thus prior art to that applicant under section 103. Id. at 1390–91. That is the legal consequence of a concession of priority which does not depend on when or where the subject matter of the claims not copied was invented. Id. at 1391 n. 3. Such consequences are imposed when an applicant, by refusing to copy claims, prevents an award of priority based on evidence of record. However, when, as in the present case, priority is awarded on the basis of evidence of record, the law will not infer facts which are contradicted by facts of record. The evidence of record in the present case consists of the factual allegations in the motion of Maltha to be accorded the benefit of his Netherlands filing date, and to shift the burden of proof. This motion, supported by the necessary documents (37 CFR 1.224), granted by the primary examiner and the Board of Patent Interferences, is evidence, accepted by the Patent and Trademark Office, that Maltha made the invention of the counts outside the United States. Because of the significantly different consequences which may ensue from an

award of priority based on evidence of record, as opposed to inferences made in the absence of evidence, we find the board's reliance on a theory of concession of priority inapposite in the present case.

The board's opinion concludes with the statement set forth above, critical of the significantly different consequences which may ensue from an award of priority based on prior invention in this country, which is prior art under section 102(g) and section 103, as opposed to an award based on prior invention in a foreign country, which is not prior art under section 103. As we said in *Hilmer (II)*, if the law as it has been written by Congress creates anomalous situations, then it is for Congress to decide whether to change the law. See *Hilmer (II)*, 424 F.2d at 1113 n. 6, 57 CCPA at 991 n. 6. We are aware that Congress is currently considering legislation to amend the patent statute. It may well wish to consider whether it would be desirable to amend Title 35 so that a foreign priority application is for all purposes given the status of an application filed in United States on the day it was first filed in a foreign country, a matter on which we express no opinion.

We have considered whether the subject matter of the counts lost in the interference falls within any "prior art" paragraph of section 102 other than section 102(g), and find that it does not. The subject matter of the lost counts is not prior art under section 102(a) because it was neither known nor used by others *in this country* before appellants' effective filing date. Further, there is no evidence that the invention disclosed in Maltha's Netherlands application No. 284,315, filed October 12, 1962, was either patented or published before appellants' effective filing date. With respect to section 102(b), Maltha's Netherlands application No. 284,315 was not even filed more than one year before appellants' effective filing date, June 6, 1963.

With respect to section 102(e), the effective date of the *disclosure* of the Maltha *patent* vis-a-vis an application filed in the United States is the United States filing date of Maltha. *In re Hilmer*, 359 F.2d 859, 882–83, 53 CCPA 1288, 1318–20 (1966), hereinafter *Hilmer (I)*. The United States filing date of the Maltha patent is subsequent to appellants' effective date. Therefore the disclosure of the Maltha patent cannot be prior art under section 102(e).

There is no other *statutory* basis for finding that either the subject matter of the lost counts or the disclosure of the Maltha patent is prior art, in the sense of 35 U.S.C. § 103, to appellants.

### Obvious Variations of the Lost Interference Counts

The board noted that appellants have neither introduced any evidence of unobvious results, nor have they even argued the question of obviousness. We assume, without deciding, that the claims on appeal are directed to obvious variations of the invention of the counts. The question remains whether there is any judicial doctrine which will support a rejection under 35 U.S.C. § 103 of such claims.

The solicitor has directed our attention to several cases which involve rejection of claims of a party losing an interference, using the counts of the interference as prior art. None of these cases involved an interference decided on the basis of the winning party's right to the benefit of an earlier *foreign* filing date under 35 U.S.C. § 119, or corresponding earlier statutory provisions. We briefly review each of the cases cited by the solicitor.

In *In re Cole*, 82 F.2d 405, 23 CCPA 1057 (1936) this court held that when an applicant has conceded that he is not entitled to a patent for the subject matter embraced in the interference counts, claims thereafter presented must be "inventively different" from the interference counts. The court in *Cole* relied on *In re Williams*, 62 F.2d 86, 20 CCPA 738 (1932); *In re Dodge*, 74 F.2d 756, 22 CCPA 870 (1935); and *In re Sola*, 77 F.2d 627, 22 CCPA 1313 (1935), which are also relied on by the solicitor here.

In *Williams*, after the declaration of the interference, the appellants filed a disclaimer and canceled their claims which corresponded to the interference counts, which was held to have been an *admission* that they were not entitled to the counts and that they were also not entitled to any subject matter failing to "define invention" thereover. In *Dodge* the subject matter of the interference counts was conceded by the appellant to be in the *prior art* and hence unpatentable to anyone. In *Sola* the appellant conceded priority of invention. As we discussed in *Ogiue*, supra, absent evidence of where the invention was made, conceding priority of the subject matter of counts is an admission that such subject matter is the prior invention of another *in this country under section 102(g)* and thus *prior art* under section 103. Further, when an applicant, as in *Dodge*, concedes the subject matter of the interference counts is in the *prior art*, it is inappropriate to question the propriety of using such subject matter as if it were *prior art* with respect to claims presented by that applicant. See *In re Hellsund*, 474 F.2d 1307, 1311, 59 CCPA 1382, 1387 (1973); *In re Nomiya*, 509 F.2d 566, 570–71 (Cust. & Pat.App.1975).

In *In re Karplus*, 97 F.2d 100, 25 CCPA 1192 (1938) this court relied upon the holding in *Cole* to reject claims as not "patentably distinct" over the count of an interference. The Board of Appeals' opinion had noted that the Karplus application had been involved in several interferences, each of which was terminated by dissolution rather than by any award of priority. From the Karplus Petition for Rehearing it appears that the subject matter of the count had, during the interference, been held to be in the *prior art* and therefore unpatentable to anyone. Karplus was estopped by the interference judgment to assert that the subject matter of the count was not in the prior art.

The appeal in *In re Fenn*, 315 F.2d 949, 50 CCPA 1163 (1963) followed an interference which had been dissolved after appellant filed an abandonment of the contest, 37 CFR 1.262(b). See *Schnick v. Fenn*, 277 F.2d 935, 938 n. 2, 47 CCPA 1174, 1178 n. 3 (1960). Under 37 CFR 1.262(b), this court held that the appellant stood in the same position as he would have had there been an award of priority adverse to him with respect to the interference count. The issue presented was whether the appealed claim distinguished patentably from the interference count. 315 F.2d at 950–51, 50 CCPA at 1165. Both parties in *Schnick v. Fenn*, supra, had worked in this country. Therefore, with respect to *Fenn*, the subject matter of the count may be considered to have been the prior invention of another *made in this country*.

Finally, the solicitor directs our attention to a portion of the principal opinion of the court in *In re Bass*, 474 F.2d 1276, 1289–90, 59 CCPA 1342, 1359 (1973). In the page referred to by the solicitor it is first stated that prior invention under section 102(g) is prior art. The facts of the present case do not comply with the "in this country" provision of section 102(g) and it is therefore inapplicable. The page referred to by the solicitor then distinguishes the facts of *Bass* from the facts of *Hilmer (I)*. The facts of the present case are analogous to the facts of the *Hilmer* cases in that here, as there, we are asked to give an invention apparently made outside the United States the same effective date as a reference as it would have had, had it been made in this country. This is contrary to what we have found to be the express desire of Congress and statutory limitations to events which take place in the United States. We find nothing in the page referred to by the solicitor which is relevant to the present case.

■ The board based the rejection under 35 U.S.C. § 103 on the theory that an applicant who has lost an interference can never be entitled to claims which are obvious variations of the invention defined in the lost counts. We find no judicial doctrine which supports this rejection under 35 U.S.C. § 103.

### Conclusion

The decision of the board affirming the rejection of claims 6, 7, 10–18, and 21–25 is *reversed.*

*Reversed.*

### APPENDIX

### The Subject Matter

The subject matter of the claims is a vulcanizable composition comprising a mixture of a polymeric compound capable of being cross-linked to form a thermoset material, and a cross-linking agent in an amount sufficient to effect the desired degree of cross-linking. The cross-linking agent is a polyperoxy compound having at least two peroxy groups (–OO–). One oxygen atom of each of two of these peroxy groups is linked to a common carbon atom. The other oxygen atom of each of these two peroxy groups is linked to a tertiary carbon or silicon atom of an organo group. A simplified drawing of one pair of these peroxy groups may be illustrated as:

$$(t\text{–group})\text{–OO–}\overset{\textstyle |}{\underset{\textstyle |}{C}}\text{–OO–}(t\text{–group})$$

The common carbon atom is part of an aliphatic group which has at least two carbon atoms and includes at least one carboxy group. This carboxy group may be present as an acid (–COOH), an ester (–COOR), an acid anhydride ($-\overset{O}{\overset{\|}{C}}-O-\overset{O}{\overset{\|}{C}}-$), or a metal salt (–COOM). The cross-linked composition which is the product of heat-curing this vulcanizable composition is also claimed. Claims 6 and 13 are representative:

6. A vulcanizable composition comprising an intimate mixture of a polymeric compound capable of being cross-linked to form a thermoset material, and cross-linking agent in an amount sufficient to afford about the desired degree of cross-linking, which agent is a polyperoxy compound having at least two peroxy groups, one of the oxygens of each of two of said peroxy groups being linked to a common carbon atom and each of the other oxygens being linked to a tertiary atom of an organo member which tertiary atom is selected from the class consisting of carbon and silicon and said common carbon atom being part of an aliphatic group selected from those having 2–3 or 5–6 carbons plus at least one carboxy group and those having 4 carbons plus at least one carboxy group selected from

–COOH, –COOM and –C–O–C–, where M is a metal ion.

13. A cross-linked composition comprising the product of heat curing a composition comprising an intimate mixture of a ploymeric compound selected from the class consisting of solid polyolefins and elastomers and a cross-linking agent in an amount sufficient to convert said polymeric compound to a cross-linking thermoset material, which agent is a polyperoxy compound having at least two peroxy groups (one pair), one of the oxygens in each of said peroxy groups of one pair being linked to a common carbon atom and the other oxygen being linked to a tertiary atom, selected from the class consisting of carbon and silicon, of an organo group selected from the class consisting of aliphatic hydrocarbon, cycloaliphatic hydrocarbon, aralkyl hydrocarbon and silyl having not more than a total of 24 carbon and silicon atoms; said common carbon atom being part of an aliphatic group selected from those (a) having 2–3 or 5–6 carbon atoms, having only saturated linkages between said carbons, plus at least one acid group selected from the class consisting of –COOH; –COOR; –COOM, and $-\overset{O}{\overset{\|}{C}}-O-\overset{O}{\overset{\|}{C}}-$, and (b) having 4 carbon atoms with only saturated linkages between said carbons plus at least one acid group selected from –COOH, –COOM and $-\overset{O}{\overset{\|}{C}}-O-\overset{O}{\overset{\|}{C}}-$, where R is a straight chain aliphatic hydrocarbon group having 1–18 carbon atoms and where M is a metal ion.

*The Interference Counts*

1. In a process for cross-linking a copolymer of ethylene and a monomer containing a $CH_2 = CH-$ group with the aid of a peroxidic initiator, the improvement comprising employing as an initiator a compound having the general formula

$$(CH_3)_3C-O-O-\underset{\underset{\underset{\underset{\underset{OR}{|}}{C=O}}{|}}{\overset{\overset{\overset{\overset{CH_3}{|}}{C}}{|}}{\underset{CH_2}{|}}}-O-O-C(CH_3)_3$$

in which R is a hydrocarbon group having not more than 20 carbon atoms.

2. A process as defined in count 1, in which the cross linking is carried out in the presence of at least one added auxiliary agent.

3. An article comprising a cross-linked copolymer of ethylene and a monomer containing a $CH_2 = CH-$ group obtained by the process defined in count 1.

4. A new composition of matter comprising a copolymer of ethylene and a monomer containing a $CH_2 = CH-$ group, and an organic compound having the general formula

$$(CH_3)_3C-O-O-\underset{\underset{\underset{\underset{\underset{OR}{|}}{C=O}}{|}}{\overset{\overset{\overset{\overset{CH_3}{|}}{C}}{|}}{\underset{CH_2}{|}}}-O-O-C(CH_3)_3$$

in which R is a hydrocarbon group having not more than 20 carbon atoms.

5. A new composition of matter as defined in count 4 containing in addition at least one added auxiliary agent.

MARKEY, Chief Judge (concurring).

I join the well-written opinion of the majority. Exercising that which should be rarely exercised, the judicial privilege of additional comment, I append these few remarks.

The board's basis for affirming the rejection was not clearly stated. The board's opinion uses language from 35 U.S.C. § 103 and fails to indicate reversal of the examiner's reliance thereon. Though the board *said* it was not employing 35 U.S.C. § 102(g) coupled with 35 U.S.C. § 119, it had to have done just that, as indicated below, before it could label the appealed claims "obvious variants."

It seems clear that the limiting phrase "in this country" of 35 U.S.C. § 102(g) served the basic interests of the United States and the purpose of our patent system i. e., to encourage disclosure here. In earlier, more isolated times, the existence of prior inventions elsewhere in the world, which were not patented or described in a printed publication, was of little or no moment within our borders. Treaty provisions designed to achieve reciprocity, as reflected in 35 U.S.C. § 119, were not intended to create a new source of "prior art." Whether accelerated communication has so "shrunk" the world as to require that Maltha's invention, on which a patent application had been merely filed in a foreign land, must from its foreign filing date constitute an obstacle to patent-resulting disclosures by our citizens is, I fully agree, a matter for the Congress. The statute, as it now stands, is to the contrary.

Whether 35 U.S.C. § 135(a) be procedural or substantive, it provides that an adverse interference decision is a final refusal only of "the claims involved." We are not at liberty, it seems to me, to add "or obvious variants thereof" to that phrase in the statute when, as here, the adverse decision rests only on an earlier foreign filing. Hence the very wording

of the statute impels the court's rejection of the solicitor's argument built on 35 U.S.C. § 135(a).

The desire of courts to avoid untoward results has often led to a desirable growth in the life of the law. That desire can also lead to such confusion in the law as to render society almost rudderless in the area involved. Though the law of patents seems occasionally a particular victim, the phenomenon occurs in all types of cases. Whether it arises as an element of social jurisprudence or in an effort to effectuate a perceived public policy, the dichotomy between the so-called activists, who would reach for the "proper" result, and the so-called literalists, who would rigidly "follow" the law as written, has probably existed since courts began. An almost infinite shading exists between instances at opposite ends of the spectrum. In seeking a "just" result, the written law may in some cases be only slightly tilted, while in others it may be bent and twisted into unrecognizable and grotesque forms. On the other hand, literal application of statutory law may produce results extending from those only slightly spaced from equity to those so remote from our traditional concepts of justice as to cry out for change in the written law. Similarly, we who are charged with the duty of deciding and of explaining our decisions may, from case to case, often and rightly find ourselves at various wavelengths in the activism-literalism spectrum. Happily, the constant activist, for whom the result controls, and the total literalist, for whom the result is irrelevant, are rare if not extinct.

Though now encrusted with varying and variable judicial interpretations, the patent law is statutory. Our representative form of government requires that the enactments of its Congress must always be, at the very least, the starting point. There being no common law of patents, we should take care to fill the Holmesian interstices of the statute with judge-made law only under the gravest and most impelling circumstances.

Though the attraction of the result reached is strong, I am unable to join the opinion of my brother in dissent. In this regard, I am in accord with the remarks of my brother in concurrence. It is an undeniable truism that Congress, along with this court and every other respecter of our patent system, intends that patents be issued only upon those claimed inventions which meet established standards of novelty, utility and unobviousness. But a determination of whether claims meet the unobviousness standard requires that there be something over which the claims may or may not be held obvious. The troubling question may be stated as "Compared to what?" My primary difficulty with the board's decision, and with the otherwise consistent reasoning of the dissent, lies in their underlying premise, i. e., that the lost interference counts herein exist as comparison material useable in considering patentability of the claims on appeal. If they do not, it cannot be said that appellants' claims are obvious variants of anything. In my view, the subject matter of the lost counts was not available for comparison. It was not available under 35 U.S.C. § 102 because it was not an invention made in this country. It was not available under 35 U.S.C. § 135(a) because that section does not provide for comparison or any other testing of obviousness. That the broad congressional intent may have been to limit patent claims to those unobvious over prior inventions made *in this country* finds support in the enactment of 35 U.S.C. § 102(g). I can find no support in the present statute, or in its legislative history, for the view that Congress intended the obviousness standard to be applied in the light of an invention set forth in the counts of an interference lost only because of an earlier foreign filing date.

If, upon return of the case, the examiner finds no other basis of rejection, adherence to the language of the statute in the present case may produce a clearly undesirable result, i. e., the existence of a second patent containing claims

which vary only obviously from claims in an earlier patent. That result does, however, have at least one potential compensation. Adherence to the statute may encourage limited statutory amendment, applicable to the precise facts here confronted.

Until such time as it shall be provided in law that one who loses an interference because of an earlier foreign filing date of another shall thereafter be precluded from obtaining a patent on an invention which would have been obvious if the subject matter of the counts of that interference had existed in this country at the time the invention was made, we must reach the result herein when presented with the precise facts now before us.

RICH, Judge (concurring).

The purpose of these brief remarks is to preclude any upsetting effect the dissenting opinion might have on the court's total rejection of the solicitor's novel use of 35 U.S.C. § 135(a) to create "prior art" for the purposes of 35 U.S.C. § 103 when there is admittedly no other statutory basis to do so.

At the outset, I would emphasize that there clearly is no rejection before us other than a § 103 obviousness rejection. Review of the record and the recording of the oral argument of the solicitor makes that amply clear. He categorically stated that *the* basis of rejection is § 103. His use of § 135(a) was solely for the purpose of providing the essential "prior art" under § 103, against which the claimed invention can be measured for obviousness or unobviousness.

The dissenting opinion acknowledges that "the majority opinion correctly * * * disposes of a 35 U.S.C. § 103 rejection * * *." This is an implicit rejection of the solicitor's theory. The court is, therefore, unanimous in rejecting that theory.

In attempting to use § 135(a) as the basis for affirming the board, the dissent is thus not applying the solicitor's novel theory but another novel theory that § 135(a) gives rise to an *"implied bar* to appellants' claims arising from an adverse award of priority." (Emphasis mine.) No such "bar," implied or otherwise, has been argued to the court. It was not the Patent and Trademark Office that conceived of using an 1836 Senate report, dealing with conditions long since dissipated by the creation and effective operation of a Patent Office having an examining corps, to support a wholly new interpretation of the Patent Act of 1952.

The dissenting opinion undertakes to find its "implied bar," which was never recognized by the solicitor, only in an ambiguous sentence in the board's opinion. The board, attempting to rephrase the basis of the examiner's rejection said, somewhat ineptly:

> As we interpret the reasoning of the examiner, it is simply that the subject matter sought to be patented is barred to appellant [sic] by reason of the award of priority as to the counts of the interference under 35 U.S.C. § 135.

This is the one and only reference to § 135 in the Office. No reference to it appears in the examiner's final rejection or in his subsequent action, or in the Examiner's Answer.

What did the board mean by "under 35 U.S.C. § 135"? What does that clause modify? The dissent reads it, mistakenly, I think, as saying "barred * * * under 35 U.S.C. § 135." I think all the board was saying was "award of priority * * * under 35 U.S.C. § 135." Section 135 is the obvious statutory basis for awards of priority, and the latter reading makes sense. In the total absence of any indication by the board that it was predicating the "bar" on § 135, rather than on the "award of priority," the former reading is, to say the least, somewhat strained. In any case it is a weak reed on which to lean in charging the majority with resting its decision on a "false premise" and with reaching "an absurd result." The board's statement is not quite as "specifically and plainly stated" as the dissent assumes it to be, at least to this reader. When the board wants to plainly and specifically make

rejections *additive* to those of the examiner, it is quite able to do so under 37 CFR 1.196(b). This it did not do.

Needless to say, I agree with Judge LANE's opinion.

MILLER, Judge (dissenting).

## BASIC ERRORS IN MAJORITY OPINION

The majority and concurring opinions rest on a false premise, namely:

> The sole basis of rejection is under 35 U.S.C. § 103, the rejected claims being held obvious in view of the subject matter of the counts of the interference.

From this, an erroneous statement of the "sole issue" is then postulated, to wit:

> whether claims may be rejected under 35 U.S.C. § 103 on the ground that a losing party to an interference is not entitled to claims which are *asserted* to be obvious variations of the invention defined in the counts, when section 102(g) and interference estoppel are not applicable. [Emphasis supplied.]

The involved claims do not come before this court on a basis that they are *asserted* to be obvious. They have been *held* by the Board of Appeals to be not patentably distinct from the invention defined in the counts lost in the interference, and appellants' failure below even to argue the point should remove it from this court's review. In any event, the majority opinion assumes the correctness of the board's holding. As the board said:

> It is our position that it would [sic] *prima facie* obvious to one of ordinary skill in this art to use the acid, the ester or the metal salt, interchangeably. Also, we consider that the use of adjacent homologs as the main chain or as the ester forming alcohol constitute [sic] obvious variations and are not patentably distinguishable from the counts. We note that not only have appellants not come forth

with any showing of unobvious results, but have not even argued the question of obviousness.

The examiner consistently took the position, as stated in his answer, that:

> Claims 6–7, 10–18 and 21–25 are rejected under 35 U.S.C. § 103 as unpatentable over the counts of Interference No. 97,329.

However, the board clearly and deliberately avoided committing itself to that ground of rejection. This is what it said:

> Claims 6, 7, 10–18 and 21–25 stand rejected "under 35 U.S.C. § 103" as unpatentable over the counts of Interference No. 97,329 in which a decision on priority adverse to appellants was rendered. *As we interpret the reasoning of the examiner, it is simply that the subject matter sought to be patented is barred to appellant [sic] by reason of the award of priority as to the counts of the interference under 35 U.S.C. § 135.* [Emphasis supplied.]

After specifically indicating that its rejection was not under 35 U.S.C. § 102(g), the board made the following statement which, contrary to Judge Rich's concurring opinion, can hardly be said to represent a "total absence" of a section 135 basis for rejection:

> Rather, the rejection is on the basis that appellant [sic] has lost the interference and, in view of the adverse decision on priority, is not entitled to claims which correspond to or are obvious variations of the invention as defined in the counts of the interference.

It is to be noted that the solicitor, in his brief (p. 3), quotes this statement. If the board had been relying solely on a 35 U.S.C. § 103 rejection, it would have cited the *claims* of the Maltha et al. patent rather than the *counts*, which had been lost in an interference under 35 U.S.C. § 135. Contrary to the impression that might be received from Judge Rich's concurring opinion, this court does not review the solicitor's interpretation of the board's opinion, but reviews the deci-

sion of the board. *Hunt v. Treppschuh,* 523 F.2d 1386, 1388 (Cust. & Pat.App. 1975).

Perhaps, as the majority opinion says, "the examiner's position was not specifically reversed by the board," but it should be clear from the foregoing that there was no *sole* basis of rejection under 35 U.S.C. § 103. Accordingly, while the majority opinion correctly, albeit laboriously, disposes of a 35 U.S.C. § 103 rejection, it fails to respond to the rejection specifically and plainly stated by the board, quoted above. An identical fact situation has been before the court in at least four previous cases. *In re Hilmer,* 424 F.2d 1108, 57 CCPA 985 (1970) (*"Hilmer II"*); *In re Risse,* 378 F.2d 948, 54 CCPA 1495 (1967); *In re Walker,* 213 F.2d 332, 41 CCPA 913 (1954); *In re Normann,* 150 F.2d 708, 32 CCPA 1248 (1945). Thus, there can be no question that the board means it when it states that the loser of an interference is not entitled to claims that are obvious variations of the invention defined in the counts. The court has a duty to respond to this statement directly.

## THE CONTROLLING ISSUE

The *controlling issue* in this appeal is whether appellants, having lost an interference on the basis of the foreign filing date of a patentee, are barred from obtaining claims that are "obvious variations" (not patentably distinct) of the invention defined in the counts of the interference.

## LEGISLATIVE HISTORY AND CONGRESSIONAL INTENT

The interference was declared and decided pursuant to 35 U.S.C. § 135, subsection (a) of which provides:

Whenever an application is made for a patent which, in the opinion of the Commissioner, would interfere with any pending application, or with any unexpired patent, he shall give notice thereof to the applicants, or applicant and patentee, as the case may be. The question of priority of invention shall be determined by a board of patent interferences (consisting of three examiners of interferences) whose decision, if adverse to the claim of an applicant, *shall constitute the final refusal by the Patent and Trademark Office of the claims involved,* and the Commissioner may issue a patent to the applicant who is adjudged the prior inventor. . . . [Emphasis supplied.]

The original precursor of section 135 was section 8 of the Act of July 4, 1836 (5 Stat. 120–21), which provided:

That whenever an application shall be made for a patent which, in the opinion of the Commissioner, would interfere with any other patent for which an application may be pending, or with any unexpired patent which shall have been granted, it shall be the duty of the Commissioner to give notice thereof to such applicants, or patentees, as the case may be; and if either shall be dissatisfied with the decision of the Commissioner on the question of priority of right or invention, on a hearing thereof, he may appeal from such decision, on the like terms and conditions as are provided in the preceding section of this act; and the like proceedings shall be had, to determine which or *whether either of the applicants* is entitled to receive a patent as prayed for. [Emphasis supplied.]

Section 6 of the 1836 Act provided:

That any person or persons, having discovered or invented any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement on any art, machine, manufacture, or composition of matter, not known or used by others before his or their discovery or invention thereof, and not, at the time of his application for a patent, in public use or on sale, with his consent or allowance, as the inventor or discoverer; and shall desire to obtain an exclusive property therein, may make application in writing to the Commissioner of Patents, expressing such desire, and the Commissioner, on due proceedings had, may grant a patent therefor. . . .

Necessarily, the determination under section 8 of whether either of the applicants was entitled to receive a patent would have had to be consistent with the requirements for patentability prescribed by section 6.

The report of the Senate Select Committee on the State and Condition of the Patent Office (S.Rep. No. 338, 24th Cong., 1st Sess. 2–6 (1836)), which accompanied the bill that became the 1836 Act, said:

> The Act of 1793, which is still in force, gives . . . no power to the Secretary [of State] to refuse a patent for want of either novelty or usefulness. The only inquiry is whether the terms and forms prescribed are complied with. . . . The necessary consequence is, that patents have . . . been daily granted without regard to the question of novelty, or even utility in the ordinary sense
>
> . . . . .
>
> Under the act referred to, the Department of State has been going on for more than forty years, issuing patents on every application, without any examination into the merit or novelty of the invention. And the evils which necessarily result from the law as it now exists, must continue to increase and multiply daily till Congress shall put a stop to them. Some of them are as follows:
>
> . . . . .
>
> 4. It opens the door to frauds, which have already become extensive and serious. It is represented to the committee that it is not uncommon for persons to copy patented machines in the model-room; and, having made some slight *immaterial alterations*, they apply in the next room for patents. . . .

In this collision and *interference* of patents, the original and meritorious inventor sees his invention, to the perfection of which he has devoted much time and expense, pirated from him, and he must forego the reward which the law was intended to secure to him in the exclusive right it grants; or he must become involved in numerous and expensive lawsuits in distant and various sections of the country, to protect and confirm his rights. [Emphasis supplied.]

Declaring that "the first and most desirable object of a revision and alteration of the existing laws on this subject" was to prevent the evils which had resulted from "the unrestrained and promiscuous grants of patent privileges,"[1] the report continued:

> A power in the Commissioner of the Patent Office to reject applications for want of novelty in the invention, it is believed, will have a most beneficial and salutary effect in relieving meritorious inventors, and the community generally, from the serious evils growing out of the granting of patents for every thing indiscriminately, *creating interfering claims*, encouraging fraudulent speculators in patent rights, deluging the country with worthless monopolies, and laying the foundation for endless litigation.
>
> . . . . .
>
> . . . The present law waits till infringements and frauds are consummated—nay, it even aids them; and then it offers an inadequate remedy for the injury, by giving an action for damages. It ought, rather, *by refusing to grant interfering patents*, to render prosecutions unnecessary. [Emphasis supplied.]

From the foregoing, it is clear that the intent of Congress in enacting section 8 of the 1836 Act was not only to prevent

---

1. Under the Patent Act of 1790 (1 Stat. 109), the Secretary of State examined applications for patentability. However, examination was eliminated by the Patent Act of 1793 (1 Stat. 318) and not restored until the 1836 Act. It was the examination system, which has been expanded and refined over the ensuing one hundred and forty years, which insured that the patent grant would not be "unrestrained and promiscuous."

the granting of interfering patents but also to prevent an applicant involved in an interference from obtaining a patent unless his invention satisfied the requirements for patentability. See *Jones v. Wetherill*, 13 Fed.Cas. 1069 (No. 7,508) (C.C.D.C.1855); *Potter v. Dixon*, 19 Fed. Cas. 1145 (No. 11,325) (C.C.S.D.N.Y. 1863).

There is nothing in the amendatory language or legislative history of subsequent statutes, including the Act of July 8, 1870, ch. 230, 16 Stat. 198, 204, and the Act of July 19, 1952, ch. 950, Pub.L. No. 593, 66 Stat. 792, 801–02, to show any change in this Congressional intent. Although the "whether" provision in section 8 of the 1836 Act was dropped (without legislative comment) from the successor section (§ 42) of the 1870 Act, Rule 59 of the Patent Office, promulgated July 15, 1870, in accordance with the 1870 Act provided:

> If an interference has been properly declared, it will not be dissolved without judgment of priority . . . unless the invention is found not to be patentable or . . . .

This clearly implied that an interference would be dissolved if the counts were not patentable to an applicant. Similarly, 35 U.S.C. § 135 does not contain language referring to the determination in an interference proceeding of whether any of the applicants involved in the proceeding is entitled to a patent. However, unpatentability of the counts to an applicant involved in an interference with another applicant is a basis for a motion to dissolve the interference. 37 CFR 1.231, 1.237, 1.258, and 1.259. See also *Noxon v. Halpert*, 128 USPQ 481 (Comm'r Pats.1953) and M.P.E.P. 1105.-05. Thus, although the question of patentability is not ancillary to the question of priority in the interference proceeding itself, the Congressional intent, to prevent an applicant involved in an interference from obtaining a patent unless his invention satisfies the requirements for patentability, has been continued.[2]

This Congressional intent was underscored with the change made to old 35 U.S.C. § 52 (now 35 U.S.C. § 135) by the 1952 Act to provide that a decision on priority adverse to the claim of an applicant "shall constitute the final refusal by the Patent and Trademark Office of the claims involved . . . ." Clearly this provision means that an applicant who loses an interference shall not obtain a patent for the counts lost in the interference.

The Congressional committee reports accompanying the bill which became the Patent Act of 1952 show no correlation between section 102(g) and the later section 135 other than to retain "the present rules of law governing the determination of priority of invention." S.Rep. No. 1979, 82d Cong., 2d Sess. 17–18 (1952); H.R.Rep. No. 1923, 82d Cong., 2d Sess. 17–18 (1952), U.S.Code Cong. & Admin.News 1952, pp. 2394, 2410. The *Commentary on the New Patent Act*, 35 U.S.C.A. at 19, explains that these are the rules "developed by decisions." One of those decisions was *In re Normann, supra*, discussed later in this opinion.

### "OBVIOUS VARIATIONS"

The phraseology used by Congress to define the requirements for patentability has remained fundamentally unchanged over the years. The Act of 1790 specified "useful" and "not before known or used." The words "new and useful" first appeared in the Act of 1793[3] and

2. It is to be noted that Rule 232 of the Patent Office Rules of Practice, March 1, 1949, and January 1, 1953, also provided for unpatentability of the counts to an applicant involved in an interference with another applicant as a basis for a motion to dissolve the interference. Such long-continued administrative interpretation is a presumptively correct interpretation of the statute involved. *Costanzo v. Tillinghast*, 287 U.S. 341, 345, 53 S.Ct. 152, 77 L.Ed.

350 (1932); *National Lead Co. v. United States*, 252 U.S. 140, 145–46, 40 S.Ct. 237, 64 L.Ed. 496 (1920).

3. Section 1 of the 1793 Act provided:

That when any person or persons, being a citizen or citizens of the United States, shall allege that he or they have invented any new and useful art, machine, manufacture or composition of matter, or any new and use-

have been continued down to present 35 U.S.C. § 101.[4] Until the 1952 Act, there was no reference to "a person having ordinary skill in the art to which said subject matter pertains," such as appears in 35 U.S.C. § 103; nor do we find the phrase "obvious variations," as such, in the contemporary literature. Nevertheless, the requirement that there be more ingenuity and skill than that possessed by a person having ordinary skill in the art ("unobviousness") was latent in the 1836 Act, if not in the early Patent Acts, and its successors.

In struggling with the concepts of "new" and "useful," the courts and patent authorities considered the "principle"[5] or "substance" of the invention and were not persuaded by mere differences in form. Thus, in *Whitney v. Emmett*, 29 Fed.Cas. 1074, 1078 (No. 17,-585) (C.C.E.D.Pa.1831), Justice Baldwin declared:

> The novelty of an invention is either the manufacture produced, or the manner of producing an old one; if the patent is for the former, it must be for something substantially new, different from what was before known; if the latter, the mode of operation must be different, not a mere change of the form and proportions; if both are the same in principle, structure, mode of operation, and produce the same result, they are not new, though there may be a *variance* in some small matter for the purpose of evasion, or as a colour for a patent." [Emphasis supplied.]

In a similar vein, Curtis, *Law of Patents* 6–7 (1849) states:

> So, too, mere *colorable variations*, or slight and unimportant changes, will not support a patent . . . . In such cases, if the consequences resulting from the change are unimportant, and the change consists merely in the employment of an *obvious* substitute, the discovery and application of which could not have involved the exercise of the inventive faculty, in any considerable degree, then the change is treated as merely a *colorable variation*, or a double use, and not as a substantive invention. [Emphasis supplied.]

Webster, *Law and Practice of Letters Patent for Inventions* 49 (London 1841) puts it as follows:

> He is not the true and first inventor who has a material part of the invention suggested to him by another . . . . .

A similar approach was taken in defining the concept of "identity" of invention. Absolute identity was not required. Curtis, *supra* at 262, says:

> An infringement involves substantial identity, whether that identity is described by the terms, "same principle," same modus operandi, or any other. It is a copy of the thing described in the specification of the patentee, either without variation, or with only such *variations* as are consistent with its being in substance the same thing. [Emphasis supplied.]

*Substantial* identity was determined to be the test in an interference in *Tyson v.*

---

ful improvement on any art, machine, manufacture or composition of matter, not known or used before the application, and shall present a petition to the Secretary of State . . . praying that a patent may be granted therefore, it shall and may be lawful for the said Secretary of State, to cause letters patents to be made out in the name of the United States . . . thereupon granting to such petitioner, or petitioners . . for a term not exceeding fourteen years, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said invention or discovery . . . . .

4. 35 U.S.C. § 101 provides:

   Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

5. In *Barrett v. Hall*, 2 Fed.Cas. 914, 923 (No. 1047) (C.C.D.Mass.1818), Justice Story said: "The true legal meaning of the principle of a machine, with reference to the patent act, is the peculiar structure or constituent parts of such machine."

*Rankin*, 24 Fed.Cas. 490, 493 (No. 14,320) (C.C.D.C.1853).

It fell to the Supreme Court to break with the preoccupation over "principle" and "substance" of the invention. In *Hotchkiss v. Greenwood*, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683 (1850), the Court, deciding a case under the 1836 Act, declared:

> For unless more ingenuity and skill . . . were required . . . than were possessed by an ordinary mechanic acquainted with the business, there was an absence of the degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skilful mechanic, not that of the inventor.

Thus, a patentable invention requires more ingenuity and skill than that possessed by a routineer—a person having ordinary skill in the art to which the subject matter pertains—namely "unobviousness."[6]

In view of the foregoing, the following conclusion is inescapable: If we are to give meaningful recognition to the intent of Congress, carried down through the years from the Act of 1836, that an applicant involved in an interference proceeding shall not obtain a patent unless his invention satisfies the requirements for patentability, then section 135, *quite apart from section 103 and section 102(g)*, must at least be read to bar, by implication, an applicant who has lost an interference on the basis of the foreign filing date of a patentee from obtaining claims for not only the invention defined by the interference counts but also for any invention representing variations requiring no more ingenuity and skill than that possessed by a person having ordinary skill in the art to which the interference counts pertain (*i. e.* what the board termed "obvious variations"). As well stated by the board:

> If we were to follow appellants' reasoning to its logical conclusion, we would condone a situation in which, by presenting claims, drawn sequentially, to compounds containing carbon chains from 1 to 20 carbon atoms, or to obvious variations of the compounds, the losing party in an interference with a patent (which relied on a foreign priority date) could be granted a patent which would cover all aspects of the invention defined in the counts of the interference as to which he has been adjudicated not to be the first inventor. Obviously, this would make a mockery of the interference practice.

To this it might be added that intent for such an absurd result is not to be attributed to the Congress. *Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940).

### OTHER ERRORS IN MAJORITY OPINION

Instead of following basic rules of statutory construction that would lead to a correct decision, the majority opinion reaches an absurd result and then says that Congress should change the law.[7]

---

6. In 1 Robinson, *Law of Patents* (1890) 305–06, the author emphasized the need for *substantial variation* for novelty to exist as follows:

> Every invention which is not already accessible to the public is regarded in law as new to the public . . . . . Novelty, therefore, exists unless the invention is already in the possession of the public as an operative art or instrument, and this occurs only when the invention is a matter of existing public knowledge, or is derivable from what is known without further exercise of inventive skill. In other words, as every variation of form, as distinguished from variation in substance, is considered as effected by the imitative faculties, novelty consists in the substantial variation of the invention in question from all inventions which in contemplation of law are already open to the public.

7. So does Chief Judge Markey's concurring opinion. The rule that this court developed in dealing with obviousness-type double patenting in cases involving obvious variations of an invention claimed in an earlier patent would never have come about if the "leave it to Congress" attitude had prevailed. That rule represents recognition of what this court characterized as "one of the fundamental principles underlying the patent system, namely, that when the right to exclude granted by a patent expires at the end of the patent term, the public shall be free to use the invention as well as

It ignores the legislative history of section 135 and the clearly *substantive* intent of Congress that an applicant involved in an interference proceeding shall not obtain a patent unless his invention satisfies the requirements for patentability. Instead, it simply says:

> A reading of section 135(a) confirms that all its provisions relate to procedure rather than substance.

The majority opinion cites the *Commentary on the New Patent Act,* 35 U.S.C.A. at 37–38, for the statement that sections 131–135 deal with "procedure." But it ignores the fact that the *Commentary* does *not* say that these sections deal *only* with procedure and, in commenting on the provision in section 135 for cancellation of claims involved in an interference, states:

> This is new *in substance* and is made possible by the amplification of the right of review of the patentee provided for in section 146. [Emphasis supplied.]

Other provisions, such as new matter (section 132), the time bar (section 135(b)), and unenforceability (section 135(c)), are clearly substantive.

Instead of reviewing the board's specific ground of rejection (which is set forth in appellants' reason of appeal No. 3), the majority opinion concentrates on rebutting the solicitor's novel proposition that 35 U.S.C. § 135 is a prior art statute. But it would be a non-sequitur to conclude that this precludes reliance on section 135 for an implied bar to appellants' claims arising from an adverse award of priority.[8]

The absurdity of the result reached by the majority opinion is pointed up by its discussion of this court's opinion in *In re Ogiue,* 517 F.2d 1382 (Cust. & Pat.App. 1975). It proposes to draw an artificial distinction between a concession of priority (arising from a party's refusal to copy claims which he could make) that *prevents* an interference and a concession of priority *in* an interference that results in an award of priority. In *Ogiue,* the applicant apparently refused to copy the claims because he would lose the interference based on his opponent's foreign priority date. Under the decision reached by the majority here, however, Ogiue could have been assured of his claims (to what the court there said was essentially the same invention as that of the patentees) by simply copying the claims of the patentees and forcing them to prove right to priority based on their foreign priority date. In the appli-

---

obvious modifications thereof or obvious improvements thereon." *In re Robeson,* 331 F.2d 610, 614, 51 CCPA 1271, 1275 (1964). The court added that "to grant a second patent for an obvious variation deprives the public of those rights." Such deprivation of the public would be no less if the loser in an interference were later granted a patent for obvious variations of the invention of the counts.

8. Appellants contend that an award of priority does not per se preclude the losing party from allowance of claims to subject matter not adjudicated in the interference, citing *In re Frilette,* 436 F.2d 496, 58 CCPA 799 (1971) and *In re Taub,* 348 F.2d 556, 52 CCPA 1675 (1965). Although appellants' "per se" contention is correct, as those cases demonstrate, the cases do not help appellants. In *Frilette,* the court disagreed with the solicitor's position that the claims involved there must be patentably distinct from the interference counts, because the interference decision did not show who was the first inventor of the "subject matter" and appellants had been prevented from making such a showing in the interference. Appel-

lants' motion to broaden the interference counts to permit them to establish their earliest date of priority had been denied. The court held that appellants could not be denied the opportunity to show by affidavit that their act of inventing the subject matter of claims identical to the broadened counts proposed by the motion was prior to that of the patentee. That is not the situation here, where appellants neither moved to broaden the interference counts nor attempted to antedate Maltha et al.'s date of invention. In *Taub,* there had been an award of priority on a broad count based on evidence of priority with respect to only one species. The court pointed out that domination by the count did not preclude a showing of patentable distinction with respect to another species by a party whose invention of that species was prior to the invention of the interference winner. Clearly that case is inapposite. The decisions in both cases are entirely consistent with the Congressional intent under 35 U.S.C. § 135 referred to earlier in this opinion.

cant's subsequent ex parte proceeding, the record of the interference would show that the patentees had made the invention outside the United States, while the applicant would be treated as the first to make the invention in the United States.[9] The patentees, having won the interference, would be in a worse position than if there had been no interference. This is the situation the board here had in mind when it said:

Obviously, this would make a mockery of the interference practice.

## NORMANN AND WALKER OVERRULED

Finally, the majority and the concurring opinions lead the court to overrule *In re Normann, supra,* and *In re Walker,* 213 F.2d 332, 41 CCPA 913 (1954). In each case, the appellant had lost an interference based on the foreign priority date of his opponent. The principal issue in *Normann* was "whether the use of fresh acid in the claimed process involves invention over the counts of the interference, which counts . . . call for the use of acid broadly." This court held that the limitation of "freshness" did not involve "invention" over the lost counts and affirmed the rejection by the board. The opinion of the court did not refer to "prior art" and did not mention res judi-

cata[10] or estoppel. It clearly supports the Congressional intent that an applicant involved in an interference proceeding shall not obtain a patent unless his invention satisfies the requirements for patentability. Presumably the law of this case was carried over into the Act of July 19, 1952, one of the objectives of which was "the codification of the patent statutes and some prior case law." *Commentary on the New Patent Act,* 35 U.S.C.A. at 10.[11] The majority and concurring opinions are barren of any showing to the contrary. As pointed out earlier, there is nothing in the amendatory language or the legislative history of the 1952 Act to show any change in the above-referred-to Congressional intent.

Similarly, the opinion in *Walker* did not refer to "prior art" and did not mention res judicata or estoppel. Just like the board here, it relied not at all on 35 U.S.C. § 102(g), and it is significant that Chief Judge Markey's concurring opinion does not say that this court in *Walker* "had to have done just that." It merely noted the solicitor's argument that the court had uniformly applied the rule that "a losing party in an interference is not entitled to claims that would dominate the claims given to his successful rival."[12] Although the appealed claims here, if allowed, would not "dominate"

9. If, in fact, the party with the earlier foreign priority date had made the invention in the United States before the losing party's effective United States date, the record would not necessarily show it, because, in the interference, all the winning party would have had to show was his foreign priority date. For all the record here shows, Maltha et al. might have made the invention of the counts in the United States before appellants' date of June 6, 1963, since they needed to show only their right to their Netherlands filing date to be awarded priority. See *In re Ogiue, supra* at 1391 n. 3.

10. The U. S. Court of Appeals for the District of Columbia applied res judicata against the losing party in an interference in *United States Rubber Co. v. Coe,* 79 U.S.App.D.C. 305, 146 F.2d 315 (1945).

11. See Judge Baldwin's concurring opinion in *In re Bass,* 474 F.2d 1276, 1302 and 1303; 59 CCPA 1342, 1375 and 1377 also the main opinion at 474 F.2d 1289, 59 CCPA 1359.

12. The court cited *In re Sola,* 77 F.2d 627, 22 CCPA 1313 (1935), where appellant had conceded priority of invention in an interference and the court held that the claims on appeal contained limitations which, when considered with the other elements of the claims, did not define anything inventive over the invention on which priority had been conceded; and *In re Derleth,* 118 F.2d 566, 28 CCPA 973 (1941), where the court held appellant was estopped from making claims which it found were not patentably distinct from the counts of the interference and appellant had not objected to the holding of the Primary Examiner that the claims would be held subject to the outcome of the interference. *But see In re Long,* 83 F.2d 458, 23 CCPA 1078 (1936), where dominating claims were allowed to the losing party of an interference since the record disclosed that all parties to the interference other than appellant clearly conceded that they could not be regarded as the first inventor of the subject matter of the dominating claims.

those awarded Maltha et al. in the interference, like those in *Walker* they do not "define subject matter which [is] patentably distinct." [13] In *Walker,* this court expressly stated that the rejection was *not* based on the interference winner's foreign priority date,[14] but "upon the adverse award of priority of invention against appellant." Thus, *Walker* is squarely in point and clearly supports the Congressional intent that an applicant involved in an interference proceeding shall not obtain a patent unless his invention satisfies the requirements for patentability. The court in *Walker* and *Normann* did not give the interference winner a Pyrrhic victory by saying, "Let Congress change the law." Why should it do so today?

## CONCLUSION

Lurking behind the majority's decision is the specter of *In re Hilmer,* 424 F.2d 1108, 57 CCPA 985 (1970) ("*Hilmer II* "). The issue upon which the decision in *Hilmer II* was narrowly focused, however, is *not* before us, either for reaffirming or overruling, because the board expressly disavowed reliance on 35 U.S.C. § 102(g) coupled with 35 U.S.C. § 119. The issue that *is* before us is whether appellants, having lost an interference on the basis of the foreign filing date of Maltha et al., are barred from obtaining claims that are obvious variations of the invention defined in the counts lost in the interference.

In view of the foregoing, the court should hold that they are.

**13.** Although subservient claims may, if they represent a patentably distinct invention, be patentable, they cannot be so regarded if they are merely obvious variations of the dominant claim. *In re Taub, supra* note 8.

**14.** Thereby the court avoided the "push back" argument which had been rejected in *In re Hilmer,* 359 F.2d 859, 53 CCPA 1288 (1966) ("*Hilmer (I)* "), just as the board did here.